IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

TERRY LEE HANKINS,             §
    Petitioner,            §
VS.                            §   CIVIL ACTION NO. 4:04-CV-875-Y
                               §   (death-penalty Case)
NATHANIEL QUARTERMAN, Director,§
Texas Department of Criminal   §
Justice, Correctional          §
Institutions Division,         §
    Respondent.            §

MEMORANDUM OPINION AND ORDER
DENYING PETITION FOR WRIT OF HABEAS CORPUS

Petitioner Terry Lee Hankins ("Hankins"), sentenced to death
for capital murder, petitions the Court for a writ of habeas corpus
pursuant to 28 U.S.C. § 2254, contending that his conviction and
sentence are unconstitutional in several respects. Respondent
Nathaniel Quarterman ("the State") filed a brief in response. The
Court denies Hankins's petition for a writ of habeas corpus.

I

*History of the Case*

A jury convicted Hankins of the capital murders of Kevin
Galley and Ashley Mason, and his punishment was assessed at death
by lethal injection. See *State v. Hankins*, Cause No. 0817624D
(Criminal District Court Number 4 of Tarrant County, Tex. May 16,
2002). The conviction was appealed to the Texas Court of Criminal
Appeals, and that Court affirmed the conviction in a published

1

opinion.  See *Hankins v. State*, 132 S.W.3d 380 (Tex. Crim. App.), *cert. denied*, 543 U.S. 944 (2004).

Hankins filed a state application for writ of habeas corpus in January 2004.  In September the state habeas court issued an order adopting the State's findings of fact and conclusions of law recommending that relief be denied based on the pleadings, the exhibits filed by the parties, and the court record. (State Habeas Transcript, p. 275.)  The Court of Criminal Appeals denied relief in an unpublished written order adopting most of the trial court's findings of fact and conclusions of law.  See *Ex parte Hankins*, No. 60,227-01 (Tex. Crim. App. Nov. 10, 2004).  Hankins filed his federal petition for writ of habeas corpus in November 2005.  The State filed an answer in April 2006, and furnished the state-court records.  Hankins filed a reply brief the following June.

Briefly recounted, the evidence presented by the State at the guilt phase of the trial established that, on an evening or early morning in August 2001, Hankins killed his wife Tammy Hankins in the trailer they shared.  (R. 28:178-79.)  The next day, a Sunday, he was at his girlfriend, Barbara Fox's apartment, with Tammy's two children, Kevin Galley and Ashley Mason, for several hours. (R. 26:200.)  He seemed upset and left with the two children at around 8:00 p.m., stating that he was leaving to pick up Tammy from work. (R. 26:201-03.)  He shot and killed Kevin and Ashley in the early morning hours of Monday. (R. 28:179-80.)  The three bodies were

2

discovered by Tammy's boss, mother, and sister the following Wednesday afternoon after Tammy failed to report to work that day. (R. 26:15, 17, 25, 41-3.) Ashley was discovered naked from the chest down on the couch in the living room under pillows and clothing, shot in the face. Kevin was found naked under blankets in the bottom bunkbed in his bedroom, shot in the head at contact range. (R. 26:42, 43, 75, 88, 92, 140, 169; R. 28:61, 75.) Tammy was found under a pile of clothes in her bed, and her car was missing. (R. 26:25, 41, 43.) A note written on an envelope addressed to Hankins was found in Hankins's belongings in the trailer, and it stated that: "I guess to sum it all up I'm guilty of murder, incest, hatred, fraud, theft, jealousy, envy." (R. 26:161.) Hankins was arrested at his girlfriend's apartment Thursday morning. (R. 27:137.) He later gave a statement to the police confessing to shooting all three victims. (R. 28:179-80.)

The State presented evidence at the punishment phase of the trial that Hankins also confessed to killing his half-sister, Pearl Sevenstar, in September of 2000, by hitting her in the head with a jack stand and to killing his father, Earnie Hankins, in October of 2000, by shooting him in the face. (R. 31:20-3, 93.) Pearl's liquified remains were located in a plastic container in a car parked at the automobile repair shop where Hankins worked. (R. 31:136-40.) Earnie's mummified remains were located inside his trailer. (R. 31:88; R. 32:22.) Hankins killed Pearl in the

apartment where she and Hankins lived with two friends and told the friends that he had had her admitted to a home for pregnant, mentally-challenged women. (R. 31:20-1; R. 32:53-4.)[1]  After killing Earnie, Hankins told people that his father had moved out of state.  He then used his father's credit cards until they were cancelled and pawned his father's guns.  Hankins also continued to pay the rent for his father's trailer, mow the grass around the trailer, and run the automobile repair business his father owned where Hankins worked.  Hankins also placed numerous air fresheners in Earnie's trailer in an attempt to mask the odor of the decaying corpse. (R. 31:22-3, 39-41, 60, 65-6, 74-5, 80.)

The State also presented evidence that in July 2001, Petitioner assaulted another girlfriend, Ruth Bradley, by hitting her in the head with a metal police baton, causing a hairline fracture and a severe concussion. (R. 32:58-62.)  The State further introduced evidence that pornographic magazines were found in Kevin's bedroom in the trailer, a partially inflated male blow-up doll was found on the kitchen table, artificial penises were on the kitchen counter, and condoms and lubricating jelly were found on the coffee table in the living room near Ashley's body. (R. 32:106-110, 116.)  The State and the defense stipulated to the fact that Hankins has a biological son, Justin Jennings, with his half-sister

---

[1]     Ruth Bradley, one of the friends Hankins lived with, testified that Pearl Sevenstar had taken a pregnancy test at her encouragement, and she had informed Hankins that it was positive. (R. 32:50-2.)

Pearl. (R. 32:193.)  Finally, the contents of a notebook owned by Hankins, retrieved from Barbara Fox's apartment, were also read into evidence. (R. 26: 228-29, R. 27:154.)  In this notebook, in addition to admitting to murdering the five victims, Hankins also wrote that, when he was younger, he had had sex with his two step-mothers, and had had sex with his half-sister Pearl and with Pearl and Tammy together. (R. 32:195-202.)

II

*Standard of Review*

The pertinent terms of the Antiterrorism and Effective Death Penalty Act of 1996 (the AEDPA), 28 U.S.C. § 2254, provide:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
>     (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
>     (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in a State court proceeding.

28 U.S.C. § 2254(d)(2000).

Section 2254(d)(1) concerns pure questions of law as well as mixed questions of law and fact.  See *Martin v. Cain*, 246 F.3d 471, 475 (5th Cir. 2001).  Under the "contrary to" clause, a federal habeas court may grant the writ of habeas corpus if the state court

arrives at a conclusion opposite to that reached by the United States Supreme Court on a question of law or if the state court decides a case differently from the United States Supreme Court on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 412-3 (2000). With respect to the "unreasonable application" clause, a federal court may grant a writ of habeas corpus if the state court identifies the correct governing legal principle from the United States Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. *Williams*, 529 U.S. at 413. Under *Williams*, a state court unreasonably applies Supreme Court precedent if it "unreasonably extends a legal precedent from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 407.

Section 2254(d)(2) concerns questions of fact. *Moore v. Johnson*, 225 F.3d 495 (5th Cir. 2000). Under § 2254(d)(2), federal courts "give deference to the state court's findings unless they were "based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." *Chambers v. Johnson*, 218 F.3d 360, 363 (5th Cir. 2000) (as modified on denial of rehearing). The resolution of factual issues by the state court is presumptively correct and will not be disturbed unless the state

prisoner rebuts the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

This statute applies to all federal habeas-corpus petitions that, as with the instant case, were filed after April 24, 1996, provided that they were adjudicated on the merits in state court. *Lindh v. Murphy*, 521 U.S. 320, 326 (1997). Resolution on the merits in the habeas-corpus context is a term of art that refers to the state court's disposition of the case on substantive rather than procedural grounds. See *Green v. Johnson*, 116 F.3d 1115, 1121 (5th Cir. 1997).

III

*Issues Presented*

Hankins alleges the following seven claims in twelve grounds for relief:

A.  Hankins's trial attorneys provided ineffective assistance of counsel in violation of the Sixth Amendment because they failed to adequately investigate, develop, and present mitigating evidence at the punishment phase of the trial (grounds one through three);

B.  The trial court violated Hankins's rights under the Eighth and Fourteenth Amendments by instructing the jury that it should weigh factors for and against the death penalty in answering the mitigation-evidence special issue, and Hankins's trial attorneys provided ineffective assistance of counsel in violation of the Sixth Amendment because they failed to object to this jury instruction (grounds four through six);

7

C.    The trial court violated Hankins's Fourteenth
      Amendment rights by failing to sustain defense
      objections to the admission into evidence of
      photographs of the murder victims, and defense
      counsel were ineffective for failing to object to
      testimony from the medical examiner regarding the
      level of decomposition of the bodies (grounds seven
      and eight);

D.    The mitigation special issue the jury was required
      to answer at the punishment phase of the trial is
      unconstitutional because it does not place a burden
      of proof on the State (ground ten);

E.    The trial court denied Hankins his rights under the
      Sixth and Eighth Amendments when it refused to
      instruct the jury on the limitations placed on the
      Texas Board of Pardons and Paroles in granting
      parole (ground eleven);

F.    The trial court violated Hankins's Sixth Amendment
      rights when it quashed defense subpoenas issued by
      defense counsel in support of a pretrial hearing on
      the issue of whether the application of the death
      penalty to Hankins violated the Fourteenth
      Amendment (ground twelve); and

G.    The method of execution used by the State of Texas
      violates the Eighth Amendment because it involves
      the use of a chemical substance that has been
      banned from use in euthanizing animals (ground
      nine).

Hankins also requests an evidentiary hearing in this Court.

IV

*Procedural Issues*

Respondent contends that Hankins is procedurally barred from
raising his fifth, sixth, and eighth grounds for relief because
they were denied by the state habeas court based on an independent
and adequate state procedural bar.  At the state level, in addition

8

to ruling on the merits of these claims, the state habeas court also concluded that Hankins was procedurally barred from raising the claims because they were not raised on appeal. (SHTr.:243, 251-52.)

A federal habeas court is precluded from addressing a claim made by a state prisoner when a state court decided the claim on an independent and adequate state procedural ground. See *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991). To satisfy the independent-and-adequate requirements, the dismissal of a claim must "clearly and expressly" indicate that it rests on state grounds that bar relief, *and* the bar must be strictly and regularly followed by state courts and applied to the majority of similar claims. *Finley v. Johnson*, 243 F.3d 215, 218 (5th Cir. 2001), *citing Amos v. Scott*, 61 F.3d 333, 338-39 (5th Cir. 1995).

With regard to the State's claim that Hankins is procedurally barred from raising these grounds for relief, this Court has located no Fifth Circuit case addressing whether this state procedural ground is one that is an independent and adequate state procedural ground. A review of decisions made by the Texas Court of Criminal Appeals on this issue, however, reveals that that court has consistently held that, while the state habeas process should not be used to litigate matters which could have been and should have been raised on direct appeal, the state writ is available to review a claim that there was a denial of a fundamental federal

constitutional right, even if the claim was not raised on direct appeal. *See Ex Parte Goodman*, 816 S.W.2d 383, 385 (Tex. Crim. App. 1991); *Ex parte McKay*, 819 S.W.2d 478, 482 (Tex. Crim. App. 1990); *Ex parte Banks*, 769 S.W.2d 539, 541 (Tex. Crim. App. 1989); *Ex parte Bravo*, 702 S.W.2d 189 (Tex. Crim. App. 1982). Thus, this Court also declines to hold that the federal constitutional claims Hankins raises in these grounds for relief are procedurally barred merely because they were decided on the state procedural ground that bars claims raised on habeas review if they were not raised on appeal. Because this Court declines to hold that these grounds are procedurally barred, the Court will address the grounds on their merits.

V

*Discussion of Claims*

A. *Mitigating Evidence Ineffective-Assistance-of-Counsel Claims*

In his first through third grounds for relief, Hankins asserts that his trial counsel provided ineffective assistance of counsel at the punishment phase of the trial because they failed to adequately investigate, develop, and present mitigating evidence. Hankins asserts that, had his trial counsel further investigated Hankins's background and childhood, they would have presented a more complete history of the abuse and neglect he suffered in his childhood and that failure to do so constituted ineffective

10

assistance of counsel.   Hankins further asserts that his trial counsel were ineffective for failing to have him thoroughly tested by a forensic psychologist.   Had they done so and had they presented this testimony, Hankins argues, the psychologist could have placed his diagnosis of having an antisocial personality disorder in the context of Hankins's history.   Hankins argues that, had his trial counsel presented additional evidence of his history and the testimony of a forensic psychologist, there is a reasonable probability that he would not have been sentenced to death.

    1.   *Applicable Law*

The Sixth Amendment to the United States Constitution guarantees a defendant in a criminal case reasonably effective assistance of counsel.   *See Cuyler v. Sullivan,* 446 U.S. 335, 344-45 (1980).   In order to obtain federal habeas relief due to ineffective assistance of counsel, a petitioner must satisfy the two-prong test established in *Strickland v. Washington*, 466 U.S. 668 (1984).   Under the *Strickland* test, in order to prove that his counsel was ineffective, a defendant must prove by a preponderance of the evidence both that counsel's performance was deficient and that this deficient performance prejudiced his defense. *Id*. at 687. Courts, however, should "indulge a strong presumption" that counsel's conduct falls within the range of reasonable assistance, and a defendant must overcome the presumption that an action is sound trial strategy. *Id.* at 689.   To establish prejudice, a

petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.  In the context of ineffective assistance of trial counsel, the prejudice component of the *Strickland* test "focuses on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Williams v. Taylor*, 529 U.S. 362, 393 n.17 (2000) (citations and internal quotation marks omitted).  Reviewing courts must consider the totality of the evidence before the finder of fact in assessing whether the result would likely have been different absent the alleged errors of counsel. *Strickland*, 466 U.S. at 695-96.  The Court also noted in *Strickland* that a fair assessment of an attorney's performance requires one "to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689.

In *Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), and *Rompilla v. Beard,* 125 S.Ct. 2456 (2005)*,* the Supreme Court applied the *Strickland* standard in cases where the claim was made that counsel was ineffective by failing to investigate, and then present, potentially mitigating evidence. The Court in *Wiggins* determined that the appropriate question was whether the investigation supporting counsel's decision not to

12

introduce mitigating evidence of Wiggins' background was a
reasonable decision. *Id.* at 522-23. Under the *Strickland* standard,
a determination must be made regarding whether trial counsel used
"reasonable professional judgment" to support a limited
investigation into potential mitigation evidence. *Id.* This
analysis is done by conducting an objective review of counsel's
performance under the prevailing professional norms, in the context
of counsel's perspective at the time of trial. *Id*. In *Wiggins*, the
Court determined that trial counsel were ineffective for failing to
investigate potential mitigating evidence beyond a series of tests
conducted on Wiggins by a psychologist, a written pre-sentence
investigation report, and records from the Department of Social
Services (DSS). *Id*. at 523-24. Furthermore, the Court held that
Wiggins had been prejudiced by this failure because, had counsel
had a social history report prepared and/or followed up on the
information contained in the DSS records, counsel would have
uncovered and been able to present evidence that Wiggins suffered
from severe deprivation and abuse at the hands of an alcoholic
mother and physical and sexual abuse during subsequent foster care,
and there was a reasonable probability that the jury, confronted
with this evidence, would have returned a different verdict at
sentencing. *Id.* at  524-25, 534-36..

Then, in *Rompilla*, the Supreme Court held that trial counsel
were ineffective for failing to examine the court's file about a

prior conviction Rompilla received for rape and assault in order to prepare to represent Rompilla at the sentencing phase of his capital-murder trial, as defense counsel was on notice that the State intended to present evidence of this prior conviction in its attempt to seek the death penalty against Rompilla. *See* 125 S.Ct. at 2463-64. The Supreme Court then held that, had counsel viewed this court file, counsel would have discovered "mitigation leads" from the prison files, which indicated that Rompilla's history was very different from what Rompilla and his family had told trial counsel, including evidence of a childhood in a slum environment, a history of alcohol abuse, and previous psychological tests that pointed to schizophrenia and other disorders, as well as a low level of cognition. *See Id*. at 2468. Then, had counsel pursued these leads, counsel would have discovered that Rompilla's parents were severe alcoholics, their children were neglected, Rompilla was frequently physically abused by his father, and Rompilla suffered from organic brain damage and significantly impaired cognitive function. *See Id*. at 2468-69. The Court concluded that Rompilla was prejudiced by this failure because there was a reasonable probability that he would not have been sentenced to death had the jury heard this evidence. *See Id*. at 2469.

2.  *Mitigation Evidence Presented at Trial*

During the punishment phase of the trial, defense counsel introduced testimony from the following witnesses: Hankins's

14

mother, Virginia Lowe; two of Hankins's friends, Jason Bradley and
Jason Clements; Jason Clements's sister and mother, Krista Clements
and Karen Clements; three officers from the Tarrant County jail;
and Dr. Walter Quijano, a clinical psychologist and former employee
of the Texas Department of Criminal Justice. Virginia Lowe
testified about the extreme physical abuse she endured while
married to Hankins's father, Earnie Hankins, as well as his threats
to kill her. She further testified that, when they separated,
Earnie would not let her take Hankins, but she would see him about
once a month by visiting with him in a park. She testified that
she last saw Hankins in 1982 when she went to Tulsa and, upon
seeing him playing in a park, stopped to see him before Earnie
arrived, whereupon Hankins told her she did not need to be there.
Hankins and his father moved away from Oklahoma and she could not
find them, so she did not hear from Hankins again until she
received a letter from him after he was arrested. Hankins had been
told that she was dead. (R. 33:9-17, 21, 25.)

Jason Bradley testified that he had met Hankins ten or eleven
years earlier through mutual friends, that Hankins taught Bradley
a lot about cars, that Hankins worked with his father at his
father's garage, and that Earnie was verbally abusive and violent
towards Hankins for no reason. Bradley further testified that
Hankins lived with Bradley and his wife, Ruth, for a time, as did
Hankins's sister, Sissy. Hankins was honest and talked to Bradley

15

when he began a sexual relationship with Ruth, and Bradley moved out after his divorce was final.  Bradley further testified that Hankins's father did not like Bradley because of a prior business arrangement where Hankins made Earnie refund Bradley his money. (R. 33:27-36.)

Jason Clements testified that he had been friends with Hankins since the seventh grade and that Hankins made it through the ninth grade in school.  Clements testified that he and Hankins had some classes together in school, including shop class, and Clements described a photograph in which Hankins was teaching the class how to weld.  Clements further testified that Hankins's father would curse at him and call him names, such as "worthless piece of shit"; that Hankins was teased a lot because his hands are stuck in a hunched position and he has some other defects that are not visible, and that they became friends because they were both heavyset and were not popular or accepted. (R. 33:53-63.)  Krista Clements testified that, in December of 1997, Hankins towed her car after an accident and, by being calm and non-aggressive, was able to calm down another man at the scene who was irate and screaming because his car had also gone off the road.  She also testified that Hankins visited her family's home regularly. (R. 33:71-6.) Karen Clements testified that she is the mother of both Krista and Jason, that she knows Hankins because of his friendship with Jason, and that he had visited her home many times.  She further testified

16

that when she first met Hankins he was very polite and reserved, and that he seemed guarded, as he never discussed his family with her.  She believed that Hankins did not know what adults he could trust, and she felt that he needed to be liked. (R. 33:79-82.)

Two corrections officers and a lieutenant with the Tarrant County Sheriff's Department all testified for the defense.  They testified that Hankins had followed all of the rules of the jail the several months he had been housed there, that they had experienced no disciplinary problems with him, and that no disciplinary file had been created for Hankins because there were no written disciplinary actions regarding his behavior. (R. 33:86-96.)  Finally, Dr. Walter Quijano testified that, as a former employee of the Texas Department of Criminal Justice (TDCJ), he was familiar with the system for classifying inmates.  In addition to showing a videotape to the jury of administrative segregation housing available in TDCJ, Dr. Quijano testified about the strong security measures in place in an administrative segregation unit, should an inmate be placed there. (R. 33:102-121.)  Quijano also testified that those under a life sentence for capital murder, even when housed in the general population, have fewer privileges and freedom, as they are placed in the most restrictive classification. (R. 33:124-133.)

Prior to presenting their case at the punishment phase of the trial, defense counsel also questioned Hankins outside of the

17

presence of the jury.   Hankins testified that, when given the choice by his attorneys, he had decided not to have his two former stepmothers, June and Pam, subpoenaed to testify because they had both indicated an unwillingness to testify on his behalf. (R. 32:2-4.)   Trial counsel later put on the record, through Hankins's taking the stand during a break in testimony, that Hankins had been examined by psychiatrist Dr. Barry Mills, that there were some positive findings and some very bad findings as a result of the examination, and that Hankins had been diagnosed with one specific psychiatric disorder.   Hankins agreed with counsel that he did not want to call Mills as a witness because the cross-examination by the State would be very damaging. (R. 33:69-70.)

   3.  *Mitigation Evidence NOT Presented at Trial*

   Hankins alleges that his trial counsel failed to present certain mitigating evidence at trial, either that was known to counsel or should have been developed by counsel.   This evidence, included in a report authored by psychologist Dr. Kelly Goodness; as well as in affidavits from Hankins's mother, Virginia Lowe, and his half-sister, Peggy Sue Griever; and submitted to the state habeas court indicates that: 1) Hankins's mother abused alcohol and drugs while she was pregnant with Hankins; 2) Earnie Hankins punched and kicked Hankins's mother in the stomach when he learned she was pregnant; 3) Hankins's mother was shot in the head by Hankins's uncle at the encouragement of Hankins's father; 4)

18

Hankins's physical deformities, in addition to deformed hands, included a cleft palate and a club foot, for which he underwent numerous surgeries and speech therapy and because of which he had to repeat kindergarten, was unable to participate in sports, and was teased; 5) Hankins was exposed to an extended family that drank heavily, used drugs, and was prone to violence; 6) Earnie Hankins hid Hankins from his mother after their divorce, threatened to kill her if she tried to get possession of Hankins and, in the opinion of other family members, only wanted custody of Hankins in order to prevent Virginia from having him; 7)Earnie Hankins had sex with his own sister and his sister-in-law, and had children with each; 8)Earnie Hankins began affairs with each of Hankins's step-mothers before he was divorced from his current wife; 8) Hankins was raised in significant poverty, had little contact with his extended family after his father brought him to Texas, and attended six different elementary schools; and 9) Hankins's step-mother Pamela Mahaffey provided him with alcohol, drugs, and sex when he was fifteen years old, and later began having sex with Hankins herself, resulting in Earnie's throwing Hankins out of the house when he learned of this; and 10) Hankins continued to have a history of substance abuse, including alcohol, methamphetamines, and marijuana, but had no meaningful exposure to mental-health providers. (Petition at 21-6.)

According to the report generated by Dr. Goodness, Virginia Lowe denied drinking or doing drugs while pregnant with Hankins,

19

and Hankins was the source of this information.  It also appears from this report that Hankins was the source of information about his life in Texas, including his relationships with his step-mothers, as well as information about his substance abuse.  Most of the remaining information appears to have been gleaned from interviews with Hankins's mother and half-sister, Peggy.

Hankins also contends that his trial counsel should have had him examined by a forensic psychologist and have presented these findings at trial.  In her report, Dr. Goodness outlines the tests she performed on Hankins. (SHTr.:73-75.)   On intellectual functioning tests, Hankins scored in the high-average range of intellectual functioning, although his mathematic achievement was on the sixth grade level, and he exhibited no major neuropsychological problems. (SHTr.:76-77.) Dr. Goodness diagnosed Hankins as having early-onset depression, alcohol and polysubstance abuse which was in remission because he was in prison, a mathematics disorder, and as having an antisocial personality disorder with narcissistic and schizotypal features. (SHTr.:79-81.)

4.  *Analysis*

At the state habeas level, defense trial counsel Robert Ford and Tim Moore submitted an affidavit explaining their strategy with regards to mitigation evidence.   In this affidavit, counsel explained that psychiatrist Dr. Barry Mills interviewed Hankins and subsequently recommended to counsel that Hankins not be

20

psychologically tested because Mills believed that the results would be negative.   Mills told counsel that, in his opinion, Hankins is a psychopath and an extremely dangerous person, as he had told Mills that he planned to kill a Tarrant County jail guard. The only possible mitigation defense that Mills proposed was one based on Mills's belief that Hankins appeared to have a disorder involving a desire to have sex with the dead.   However, when this topic was broached with Hankins, he refused to consider this defense, and it was therefore not pursued. (SHTr.:126-27.)

Trial counsel also explained in their affidavit that they had planned to call Hankins's former step-mothers, Pamela Mahaffey and June Gartrell, but they declined to testify and Hankins refused counsel's offer to subpoena them.   Pamela decided not to testify after Hankins's journal, in which he stated that he was "fucking" her when she was still married to his father, was read to the jury. June refused to testify, stating to counsel that, if called, she would describe Earnie Hankins as a good father, in stark contrast to what she had previously told counsel. (SHTr.:126.)   Finally, in this affidavit, trial counsel stated that, other than Hankins's half-sister, they or their investigator personally met with every person Dr. Goodness spoke to and spoke to most of the people she attempted unsuccessfully to contact.   Counsel also stated in their affidavit that Dr. Goodness's report was based primarily on evidence contained in their trial files. (SHTr.:126-27.)

21

In deciding these three grounds for relief, the state habeas court first concluded that counsel's investigation into mitigating evidence was a reasonable one, that it was sound trial strategy not to subpoena Ms. Gartell or Ms. Mahaffey, and that it was sound strategy not to have a psychologist examine Hankins and testify regarding this examination.  The state habeas court then concluded that Hankins received adequate representation at trial and that there is no reasonable probability that, but for counsel's performance, the result of the trial would have been different. (SHTr.:231-32.)  These conclusions are not an unreasonable application of the *Strickland* standard.

First, while some evidence regarding Hankins's upbringing was not introduced at trial, comparable evidence was presented.  In particular, Hankins's mother testified that she abused alcohol when Hankins was young, that Hankins's father hit and kicked her a lot, that Hankins's father threatened to kill her if she went to the police when he hit her and threatened to kill her if she fought for custody of Hankins, that his father hid Hankins from her and prevented their meeting, and that she had no contact with Hankins after 1982. (R. 33:9-10, 11-3.)  Through the admission into evidence of the notes Hankins made in his spiral notebook, there was evidence presented that Hankins was raised in poverty, that his sister and mother left when he was six years old, that he had sexual relationships with his step-mothers, and that he abused

22

drugs and alcohol. (R. 32:194-96.)  Jason Clements testified that
Earnie kicked Hankins out of the house when he was in high school,
that Hankins had physical deformities, and that Hankins was teased
a lot because of his appearance. (R. 33:55-6, 59, 63).  And, Jason
Bradley testified that Earnie would speak in an ugly and insulting
way to Hankins, would call him names and threaten violence, and he
once witnessed Earnie throw a hammer at Hankins. (R. 33:31-2, 49).
Thus, while evidence of Hankins's corrective surgeries, evidence
that his mother was shot by his uncle, and evidence that his father
also engaged in incest with his own sister was not admitted into
evidence, given that similar evidence was admitted, Hankins has not
shown that his trial counsel were ineffective for failing to
present redundancies.

Second, some of the evidence Hankins argues should have been
presented at trial, such as the circumstances in which he lived
after he and his father moved to Texas, the extent of his substance
abuse, and further information about his relationships with his
former step-mothers, could only have been introduced if Hankins
himself testified or if counsel subpoenaed Hankins's former step-
mothers, something Hankins did not want to do.  The Fifth Circuit
has recognized that "[g]reat deference must be given to choices
[that] are made under the explicit direction of the client." *United
States v. Masat*,  896 F.3d 88, 92 (5th Cir. 1990), *citing Mulligan*

*v. Kemp*, 771 F.2d 1436, 1441 (11th Cir. 1985), *cert. denied*, 480 U.S. 911 (1987).  In *Strickland*, the Supreme Court stated that:

> [t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant.

466 U.S. at 691.  It was not ineffective assistance of counsel to follow Hankins's wishes regarding his former step-mothers, and it was not ineffective assistance of counsel to decline to call Hankins as a witness, given that such a move would have opened up cross-examination by the State regarding the voluminous evidence of Hankins's prior bad acts.

Third, counsel's decision not to call the psychiatrist who examined Hankins as a witness and not to have Hankins tested by a forensic psychologist were decisions based on trial tactics and strategy.  If counsel has made an adequate investigation, any conscious and informed decision made based on trial tactics and strategy cannot be the basis for a claim of having received ineffective assistance of counsel unless the decision was so poorly chosen that it "permeates the entire trial with obvious unfairness." *United States v. Cotton*, 343 F.3d 746, 753(5th Cir. 2003), *cert. denied*, 540 U.S. 11865 (2004), *quoting United States v. Jones*, 287 F.3d 325, 331 (5th Cir. 2002); *Smith v. Cockrell*, 311 F.3d 661, 668 (5th Cir. 2002).

The Fifth Circuit has held that neither a capital murder defendant's Fifth nor his Sixth Amendment rights are violated when he is examined by a state psychiatrist and testimony based on this interview is presented at trial where the defendant himself first introduces psychiatric evidence on the issue of future dangerousness or insanity, the State presents psychiatric testimony for rebuttal purposes only, and his trial counsel is given advance notice of the scope of the state's psychiatric examination. *Williams v. Lynaugh*, 809 F.2d 1063, 1067-69 (5th Cir. 1987); *Vardas v. Estelle*, 715 F.2d 206, 208-11 (5th Cir. 1983). Under this case law, it is clear that, had trial counsel presented evidence from either a psychologist or psychiatrist based on an examination of Hankins, they ran the risk of the State's being allowed to examine Hankins and offer evidence based on this examination in rebuttal. Indeed, on February 27, 2002, the State filed a motion to have Hankins examined by its own mental-health expert should the defense choose to have a mental-health expert testify. (Transcript, vol. 1, p. 32.) Preventing such a situation was sound trial strategy.

Moreover, the psychiatrist whom defense counsel retained believed that Hankins is a psychopath. This opinion is supported by the diagnosis by Dr. Goodness that Hankins has an antisocial personality disorder. Rather than present such a negative diagnosis to the jury, opening the door to cross-examination of the expert, and possibly resulting in similar or worse evidence being

offered in rebuttal by the State, trial counsel chose to present mitigating evidence from Hankins's family and friends and to present evidence from Dr. Quijano that, if given a life sentence, Hankins could be appropriately housed and contained in prison and would therefore not be a future danger to society. Trial counsel were not ineffective for making this strategic decision.

Finally, Hankins has failed to establish that he was prejudiced by the failure of defense counsel to present the evidence he highlights at the punishment phase of the trial because he has failed to prove that there exists a reasonable probability that, had such evidence been presented, he would not have received the death penalty. The aggravating evidence adduced at trial included Hankins's murder of five people, two of them children and one of them his mentally-challenged sister; the way in which they were murdered; the callousness with which Hankins hid his crimes and lied to others about the whereabouts of his victims; and that Hankins engaged in sexual activity with and around the dead bodies. With that evidence in mind the Court cannot conclude there is a reasonable probability that further evidence of Hankins's abusive upbringing and testimony from a psychologist that he was a substance abuser and has an anti-social personality disorder would have resulted in a life sentence. These grounds are without merit, and they are denied.

B. *Mitigation Evidence–Jury Instruction Claims*

In his fifth and sixth grounds for relief, Hankins asserts that the trial court violated his rights under the Eighth and Fourteenth Amendments by giving a particular jury instruction at the punishment phase, and in his fourth ground for relief, Hankins argues that his trial counsel provided ineffective assistance of counsel by failing to object to this jury instruction. The State responds that these grounds are without merit because the jury instruction was not objectionable, because an objection to this jury charge would not have been sustained by the trial court, and because no prejudice has been shown as a result of counsel's failure to object to the charge.

At the punishment phase of the trial, the following instruction was given to the jury:

> In deliberating on Special Issue No. 1 and Special Issue No. 2, the jury shall consider all evidence admitted at the guilt or innocence stage and the punishment stage, including evidence of the defendant's background or character or circumstances of the offense that militates for or mitigates against the imposition of the death penalty.

(Tr. IV:674.)  The relevant statute provides that such a charge shall be given to the jury, but with respect to the first special issue, concerning a defendant's future dangerousness, not the second special issue, concerning whether mitigating evidence exists such that a defendant should be given a life, rather than a death, sentence.  *See* Tex. Code Crim Proc. Art. 37.071 sec. 2(b) &

27

(d)(1)(Vernon 1991).   Defense counsel did not object to this charge.   Hankins contends that this jury instruction was unconstitutional because it informed the jurors that, in considering the mitigation special issue, they could consider evidence that militated for the death penalty in addition to mitigating evidence.

At the state level, the state habeas court, in considering these claims on their merits, concluded that the challenged instruction did not violate Hankins's due process rights or his right to individualized sentencing because the Constitution requires that a capital jury be given a vehicle to consider relevant mitigating evidence, but does not require that jurors be given an opportunity to consider mitigating evidence apart from all other evidence adduced at trial. (SHTr.:243-45.)   The state habeas court also concluded that trial counsel was not deficient in failing to object to this charge and that, given the amount and type of evidence presented at trial, Hankins had failed to establish a reasonable probability that, had an objection been made and sustained, the result of the trial would have been different. (SHTr.:246-47.)

These conclusions are neither an unreasonable application of federal law nor contrary to federal law.   As the state habeas court noted, relevant Supreme Court case law has stated that the Constitution does not require states to adopt a specific method for

28

jurors to consider mitigating and aggravating factors. *See Boyde v. California*, 494 U.S. 370, 377 (1990); *Franklin v. Lynaugh*, 487 U.S. 164, 179 (1988); *Zant v. Stephens*, 462 U.S. 862, 890 (1982). Instead, the Constitution requires that the jury be provided with an opportunity to give effect to mitigating evidence introduced at trial. *See Penry v. Johnson*, 532 U.S. 782, 797 (2001).   In the instant case, the jury was given an opportunity to give effect to mitigating evidence presented at trial, both with the mitigation special issue and the future dangerousness special issue.   In particular, the jury could give effect to evidence presented regarding Hankins's troubled childhood through the mitigation special issue and could give effect to evidence presented regarding the safety measures taken by the Texas prison system through the future dangerousness issue.   The fact that the challenged jury instruction was not the one provided for in the relevant Texas statute does not render it unconstitutional.

Moreover, Hankins has not established prejudice due to his trial counsel's failure to object to the charge.   Even had counsel done so, and the charge been corrected, there is no reasonable probability that Hankins would not have been sentenced to death. As this Court has noted earlier, both the State and the defense presented substantial evidence both in support of and in opposition to the imposition of the death penalty.   Given the large amount of evidence that militated for the death penalty, including evidence

29

that Hankins murdered five people, severely assaulted another,
abused and impregnated his mentally disabled half-sister, actively
concealed two of the murders for almost a year, and abused drugs,
alcohol, and pornographic material, Hankins has not shown that, had
the jury been instructed to consider only mitigating evidence in
deciding the mitigation special issue, there is a reasonable
probability that the jury would have answered that question in the
affirmative, resulting in a life sentence.  Hankins's fourth,
fifth, and sixth grounds for relief are without merit and are
denied.

C.    *Claims Regarding Testimony about and Photographs of the
      Deceased*

      In his seventh ground for relief, Hankins asserts that his
trial counsel were ineffective for failing to object to the
admission of testimony from the medical examiner, given during both
the guilt and the punishment phases of the trial, regarding the
level of decomposition found with each of the murder victims.  In
his eighth ground for relief, Hankins argues that the trial court
violated his due-process rights when it failed to sustain
objections lodged by defense counsel to certain photographs of the
victims admitted into evidence on the basis that they were unduly
prejudicial.

      1.  *Applicable Facts*

      At the guilt phase of the trial, medical examiner Dr. Mark
Krouse, during his description of the bodies of Kevin and Ashley,

30

testified about the level of decomposition found with each body. He further testified that the level of decomposition found was consistent with both victims' having been dead three or four days. (R. 28:56-9, 66-8.)  At the punishment phase of the trial, Dr. Krouse testified about the level of decomposition found with the bodies of Tammy Hankins, Earnie Hankins, and Pearl Sevenstar, including testimony that Earnie Hankins's body was mummified when discovered by authorities and Pearl Sevenstar's body had become liquified inside of the closed container. (R. 32:14-34.)  Defense counsel did not object to any of this testimony.

Defense counsel did object, at both the guilt and the punishment phases of the trial, to the admission of several photographs of the deceased victims on the basis that their relevance was substantially outweighed by their undue prejudice. These objections were overruled. (R. 26:113-14; R. 28:56-7, 70-1; R. 32:26-7, 32.)

     2.  *Applicable Law*

The Texas Court of Criminal Appeals has held that, generally, relevant verbal testimony and photographs of the crime scene are admissible if they aid the jury in determining things including the manner and means of the death of the victim, the force used, and the length of time the victim has been dead. *Williams v. State*, 958 S.W.2d 186, 195 (Tex. Crim. App. 1997); *Long v. State*, 823 S.W.2d 259, 271-72 n. 18 (Tex. Crim. App. 1991).  Under Texas state law,

there is a presumption of admissibility of relevant evidence and that relevant evidence is more probative than prejudicial. *Montgomery v. State*, 810 S.W.2d 372, 389 (Tex. Crim. App. 1990). A trial court's decision that the probative value of evidence outweighs its potential prejudicial effect may only be reversed on appeal upon a showing of an abuse of discretion. *Santellan v. State*, 939 S.W.2d 155, 171-72 (Tex. Crim. App. 1997).

In federal habeas proceedings the court does not sit in review of a state court's interpretation of its own law. *Creel v. Johnson*, 162 F.3d 385, 395 (5th Cir. 1998), *cert. denied*, 526 U.S. 1148 (1999); *Weeks v. Scott*, 55 F.3d 1059, 1063 (5th Cir. 1995). Moreover, in federal habeas actions, a state court's evidentiary rulings will mandate relief only when an error is so extreme that it constitutes a denial of fundamental fairness. *Little v. Johnson*, 162 F.3d 855, 862 (5th Cir. 1998), *cert. denied*, 526 U.S. 1118 (1999); *Andrade v. McCotter*, 805 F.2d 1190, 1193 (5th Cir. 1986). And, the fact that evidence that is irrelevant may have been admitted at trial does not rise to a federal constitutional error. *Romano v. Oklahoma*, 512 U.S. 1, 10-12 (1994). Federal habeas review of trial error is limited to whether the error so infected the trial with unfairness as to deny due process. *Donnelly v. DeChristofero*, 416 U.S. 637, 642 (1974). And, where there is constitutional error at trial, at the federal habeas level, the appropriate harmless error test is the one set forth in *Brecht v.*

*Abrahamson*, 507 U.S. 619 (1993).  Under this test, error is deemed harmless if it did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Id*. at 637.

3.  *Analysis*

At the state level, the state habeas court, citing numerous state cases, concluded that the admission of the photographs of the deceased victims did not violate Hankins's due-process rights because it was evidence that was relevant to his consciousness of guilt, his overall mental state, the manner and means of their deaths, and their conditions upon discovery. (SHTr.:253.)  The state habeas court further concluded that Hankins had failed to establish a reasonable probability that he would not have been sentenced to death had trial counsel objected to the medical examiner's testimony regarding the level of decomposition found with the victims' bodies, given the evidence that Hankins killed five members of his family, attempted to conceal the bodies, abused and fathered a child with his mentally challenged half-sister, and assaulted another woman with a metal baton. (SHTr.:252-54.)

These conclusions are not contrary to federal law.  With regard to the admission of the photographs of the victims, as noted earlier, a federal habeas court does not sit in judgment of a state court's interpretation of state law.  Moreover, Hankins has failed to establish that the trial court abused his discretion in admitting the photographs of the victims, much less that error was

33

committed that was so great as to constitute a denial of fundamental fairness or a substantial and injurious effect on the jury's verdict. *See Jones v. Butler*, 864 F.2d at 368 (holding that the inflammatory nature of photographs of a murder victim showing her legs spread apart and blood trickling from her genitals did not exceed their evidentiary worth as to violate due process where the photographs showed the defendant's intent and showed that the victim was raped).

And, with respect to Hankins's ineffective-assistance-of-counsel claim, the state habeas court's application of the *Strickland* standard is not an unreasonable one. While the medical examiner's description of the decomposition present in the bodies of the victims was precise and graphic, it was not more graphic than the actual facts of this case, including the fact that Hankins purposely concealed the bodies of his father and half-sister for nearly a year and then continued socializing with his girlfriend after he shot his wife and her two children to death and left their bodies in their trailer. Given the nature of the evidence presented to the jury both in the guilt and punishment phases of the trial, Hankins has failed to establish a reasonable probability that, had counsel successfully objected to the medical examiner's testimony at either phase of the trial, Hankins would not have been convicted or sentenced to death. Hankins's seventh and eighth grounds for relief are without merit, and they are denied.

D.  *Mitigation-Special-Issue Claim*

In his tenth ground for relief, Hankins contends that the mitigation special issue that the jury was required to answer at the punishment phase of his trial is unconstitutional because it does not place a burden of proof on the State.  Specifically, Hankins contends that the State should have been required to establish beyond a reasonable doubt the absence of mitigating factors sufficient to warrant a life, rather than a death, sentence.

At trial, the jury was required to answer the following mitigation special issue:

> Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

(Tr. IV:675).  The jury answered this special issue "no." *Id.* Hankins asserts that his Sixth Amendment right to a jury trial requires that the jury decide this special issue using the "beyond a reasonable doubt" standard.  In particular, Hankins cites the Supreme Court cases *Ring v. Arizona*, 536 U.S. 548 (2002), and *Apprendi v. New Jersey*, 530 U.S. 466 (2000), for support for his assertion that federal law requires that a Texas capital jury be required to find the absence of factors that mitigate against the

35

death penalty beyond a reasonable doubt before a defendant may be sentenced to death.

In addressing this issue at the state level, the Court of Criminal Appeals on direct appeal, citing several previous cases from that court which held that the absence of a burden of proof in the mitigation special issue violated neither *Apprendi* nor *Ring*, overruled this point of error. *Hankins*, 132 S.W.2d at 386; *see also Allen v. State*, 108 S.W.3d 281, 285 (Tex. Crim. App. 2003); *Rayford v. State*, 125 S.W.3d 521, 529-30 (Tex. Crim. App. 2004). This is not an unreasonable application of federal law.

Hankins argues that the mitigating special issue acts as an aggravating factor because the absence of mitigating factors aggravates his sentence from life to death, and therefore a jury must find the absence of such evidence beyond a reasonable doubt. But, contrary to Hankins's argument, the Fifth Circuit has specifically held that there is no constitutional requirement that Texas's mitigation issue be assigned a burden of proof. *Rowell v. Dretke*, 398 F.3d 370, 378 (5th Cir. 2003). And, recently, in addressing an identical argument based on the holdings in *Ring* and *Apprendi*, the Fifth Circuit specifically held that a petitioner's Sixth Amendment rights are not violated when state law does not require the prosecution to prove the absence of mitigating factors beyond a reasonable doubt. *See Grandos v. Quarterman*, 455 F.3d 529, 536-37 (5th Cir. 2006), *cert. filed*, No. 06-6932 (Sept. 28, 2006).

36

Accordingly, the Constitution does not require that the jury find beyond a reasonable doubt the absence of mitigating factors warranting a life sentence before a defendant may be sentenced to death. Hankins's tenth ground for relief is without merit, and he is not entitled to relief on this basis.   This claim is denied.

E.   *Parole Claim*

In his eleventh claim for relief, Hankins asserts that the trial court violated his rights under the Sixth and Eighth Amendments when it declined to submit a requested jury instruction to the jury at the punishment phase of the trial regarding the requirements for granting parole in Texas to a capital life offender.   In response, the State contends that this claim is without merit because it is foreclosed by Fifth Circuit precedent.

At the punishment phase of the trial, the jury received the following jury instruction from the trial court:

> Under the law applicable in this case, if the defendant is sentenced to imprisonment in the institutional division of the Texas Department of Criminal Justice for life, the defendant will become eligible for release on parole, but not until the actual time served by the defendant equals 40 years, without consideration of any good conduct time.   It cannot accurately be predicted how the parole laws might be applied to this defendant if the defendant is sentenced to a term of imprisonment for life because the application of those laws will depend on decisions made by prison and parole authorities, but eligibility for parole does not guarantee that parole will be granted.

(Tr. IV:676.)   This instruction tracks the statutory language in Article 37.071 of the Texas Code of Criminal Procedure. *See* Article

37

37.071 § 2(e)(2)(B)(Vernon 1999).  Trial counsel also requested

that the trial court submit the following instruction to the jury:

> To release on parole an inmate who is convicted of
> a capital felony who must serve 40 calendar years before
> becoming eligible for release on parole, all members of
> the board must vote on the release on parole of the
> inmate and at least two-thirds of the members must vote
> in favor of the release on parole.  A member of the board
> may not vote on the release unless the member first
> receives a copy of a written report from the department
> on the probability that the inmate would commit an
> offense after being released on parole.

(R. 33:159-60.)  The trial court declined this request and instead,

pursuant to the statute, instructed the jury that:

> During your deliberations you will not consider or
> discuss any possible action of the Board of Pardons and
> Paroles or the Governor.

(R. 33:160; Tr. IV:676.)

Hankins contends that the trial court violated his Sixth and

Eighth Amendment rights when it declined to add the requested jury

instruction.  In addressing this issue on direct appeal, the Court

of Criminal Appeals held that Hankins's constitutional rights were

not violated by this refusal because, other than the statutory jury

instruction that instructs the jury about a capital murder

defendant's parole eligibility date if given a life sentence,

parole is not otherwise a proper issue for jury consideration in

capital cases. *Hankins*, 132 S.W.3d at 386-87.  This decision is not

contrary to well-established federal law.

As support for this claim, Hankins relies on the Supreme Court

case *Simmons v. South Carolina*, 512 U.S. 154 (1994).  *Simmons* is a

38

death-penalty case in which a plurality of the Supreme Court held that, where a defendant's future dangerousness is an issue in a capital case, and the sentencing options are death or life without the possibility of parole, due process allows the defendant to inform the sentencing jury about his parole ineligibility. *Id.* at 156.

Hankins argues that *Simmons* is applicable to his case because, had he received a life sentence, he would not have been eligible for parole for forty years, a time period Hankins asserts is comparable to a life sentence without parole. Contrary to Hankins's argument, however, the plurality opinion in *Simmons* specifically limited its holding to cases where the sentencing option is between death and life *without parole*. Justice Blackmun, writing for the Court, went further and stated that "[i]n a State in which parole is available, how the jury's knowledge of parole availability will affect the decision whether or not to impose the death penalty is speculative, and we will not lightly second-guess a decision whether or not to inform a jury of information regarding parole." *Id.* at 168. Moreover, since the Supreme Court's decision in *Simmons*, the Fifth Circuit has specifically held that *Simmons* does not apply in Texas cases where parole is a possibility, but only in cases where life-without-parole is a sentencing option. *Miller v. Johnson*, 200 F.3d 274 (5th Cir. 2000); *Allridge v. Scott*, 41 F.3d 213, 222 (5th Cir. 1994).

As these precedents make clear, federal courts have determined that, where a capital offender is eligible for parole, the courts will not impose a requirement to inform the jury about parole eligibility.  Since 1999, Texas has chosen to inform capital juries about the defendant's parole eligibility.  As federal case law does not require making even this information available to jurors, this case law certainly has not established that information about how a parole board votes to parole an individual is constitutionally required.  Hankins's eleventh ground for relief is without merit and is denied.

F.  *Application of the Death-Penalty Claim*

In his twelfth claim for relief, Hankins asserts that the trial court violated his Sixth Amendment right to offer the testimony of witnesses and compel their presence when the trial court quashed subpoenas issued by Hankins to compel the testimony of several elected district attorneys at a pre-trial hearing. Hankins wished to present this testimony in order to develop evidence regarding how candidates were selected for death-penalty prosecutions in order to support a Fourteenth Amendment claim that the selection of death-penalty candidates in Texas violated Hankins's due-process rights because the capital-murder statute was applied in different ways throughout the counties of the state of Texas. (Tr. I:88-90; R. 2:3-4.) After these subpoenas were quashed by the trial court, the only evidence presented at the hearing by

40

defense was the testimony of a private attorney concerning the procedure used in the federal system for selecting death-penalty candidates. (R. 2:7-16.)   The trial court then denied defense counsel's motion to preclude the death penalty as a sentencing option. (Tr. I:88-91; R. 2:20.)

On direct appeal, the Court of Criminal Appeals held that Hankins's Sixth Amendment rights were not violated because the trial court quashed his subpoenas of district attorneys from five different counties.   In particular, that Court held that, because it had previously determined that the State has the discretion to seek the death penalty and that this discretion does not violate the Fourteenth Amendment, Hankins was not entitled to subpoena the witnesses and question them regarding the exercise of a discretion previously found to be constitutional. *Hankins*, 132 S.W.3d at 387-88.   The conclusion is not contrary to clearly established federal law.

As support for this claim, Hankins cites *Washington v. Texas*, 388 U.S. 14 (1967), and *Taylor v. Illinois*, 484 U.S. 400 (1988). These cases do not support Hankins's ground for relief.   In *Washington*, the Supreme Court ruled that a Texas statute barring co-defendants from testifying for a defendant violated Washington's Sixth Amendment right to compel testimony on his behalf. *Id*, 388 U.S. at 23.   In *Taylor*, the Supreme Court held that a defendant's Sixth Amendment right to compel testimony may be violated by a

41

discovery sanction that excludes the testimony of a material defense witness. *Id*. at 407-09.

In the instant case, Hankins wished to compel the testimony of various elected district attorneys in order to develop a claim that the Texas death penalty statute is unconstitutional because, once a person is eligible for the death penalty, it is left to the local district attorney's discretion whether or not to seek the death penalty. (Tr. I:88-91.)  But, the Supreme Court has recognized that, in general, the decision whether or not to prosecute and what to charge rests entirely in a prosecutor's discretion. *Bordenkircher v. Hayes*, 434 U.S. 357, 264 (1978).  While the decision whether to prosecute cannot be based on an "unjustifiable standard" such as race, religion, or other arbitrary classification, *Oyler v. Boles*, 368 U.S. 448, 456 (1962), Hankins has never asserted that the Tarrant County prosecutor sought the death penalty against him because he is a part of a certain class of citizens.  Rather, Hankins's argument at trial appeared to be that, because another district attorney might not have sought the death penalty against him, the Texas death penalty statute is unconstitutional.  Such prosecutorial discretion does not violate the federal constitution.  Accordingly, Hankins's Sixth Amendment right to compulsory process was not violated when the trial court quashed the subpoenas of the various district attorneys.  Hankins's twelfth ground for relief is denied.

42

G.  *Method-of-Execution Claim*

In his ninth ground for relief, Hankins argues that the method of execution used by the state of Texas constitutes cruel and unusual punishment because it involves the use of a chemical substance, pancuronium bromide, that has been banned for use in euthanizing animals.  Specifically, Hankins contends that the use of this drug as the second drug given to an inmate during an execution creates an impermissible risk that an inmate will be paralyzed, but will not be unconscious, before he is given the final, painful drug.[2]

1.  *State Proceedings*

At the state habeas level, Hankins submitted three affidavits as support for this claim.  The first affidavit is from Dr. Mark Heath, an assistant professor of clinical anesthesia at Columbia University.  In his affidavit, Dr. Heath asserts that pancuronium bromide, the second of three drugs administered during the execution of a sentence of death, is a neuromuscular blocking agent, which renders the muscles unable to contract, but does not

_____

[2]     In response, the State does not assert that this claim is not cognizable in a federal habeas petition.  Recently, in *Hill v. McDonough*, 126 S.Ct. 2096 (2006), the Supreme Court addressed the issue of whether a claim that the method of execution would constitute cruel and unusual punishment could be raised by a condemned inmate pursuant to a civil rights claim under 42 U.S.C. § 1983.  In *Hill*, the Supreme Court held that an inmate may proceed under § 1983 and is not required to file such a claim in a habeas action.  *Id.* at 2099, 2104.  Because the Supreme Court did not hold that an inmate <u>must</u> bring such a claim under § 1983 rather than in a habeas action pursuant to 28 U.S.C. § 2254, such as the instant case, this Court will consider the merits of this claim.

affect the brain or the nerves, meaning that a person would be unable to move his muscles were he experiencing pain and suffering. Dr. Heath further avers in his affidavit that there are significant risks that a person will not be rendered unconscious by sodium thiopental, the first drug administered in an execution.  He states that these dangers include: that the sodium thiopental will not properly anesthetize the inmate because it is a short-acting barbiturate; that the sodium thiopental might not work because it is from a bad batch of drugs, has been mislabeled by the manufacturer, has not been properly mixed, or has been stored beyond its shelf life; or that there might be problems administering the IV, such as missing a vein, having an extravenous injection, or solution washing back into the IV bag.  Finally, Dr. Heath further states that pancuronium bromide is unnecessary in lethal injections and serves no legitimate purpose because it could be eliminated without decreasing the efficacy or the humaneness of the procedure. (SHTr.:106-07.)

A second affidavit submitted by Hankins at the state court level is from Carol Weiher, who states in her affidavit that she underwent an eye operation in which full general anesthesia was administered but the "brain scrambling drugs" were not effective, causing her to be unable to move, but conscious and aware of the severe pain of the surgery.  Her affidavit does not, however, state what drugs she was administered or their dosage levels.

44

(SHTr.:110.) The final affidavit is from Dr. Dennis Geiser, who identifies himself as a professor of veterinarian medicine at the University of Tennessee.  In his affidavit, Dr. Geiser avers that the use of pancuronium bromide for animal euthanasia is prohibited by the ethical standards of the American Veterinary Medical Association (AVMA) and outlawed in a number of states because it does not act as an anesthetic, but instead paralyzes muscles, while still allowing for the perception of pain and discomfort.  He further states in his affidavit that sodium thiopental is not a proper anesthetic for lethal injection because one dose is a short-acting barbiturate.  Instead, according to AVMA standards, a barbiturate such as sodium pentobarbital is preferred because it is potent and long acting. (SHTr.:112.)

In response, at the state habeas level, the State submitted a copy of a page from the TDCJ website which outlines that the three drugs used in lethal injections are: 1)sodium thiopental given in a lethal dose that sedates the person; 2) pancuronium bromide, a muscle relaxant that collapses the diaphragm and lungs; and 3) potassium chloride, which stops the heart. (SHTr.:212.)  The State also submitted an article written by State Senator Kyle Janek that originally appeared in the Houston Chronicle.  In this article, Senator Janek states that he has been a licensed, practicing anesthesiologist for twenty years.  He further states that, while it is true that, were an inmate not sedated, receiving the third

drug, potassium chloride, would be a painful experience, the State of Texas administers ten times the normal dose of sodium thiopental for a man, thus insuring that the inmate will be under anesthesia when the second and third drugs are administered.  Senator Janek also states in this article that the AVMA guidelines preclude the use of pancuronium bromide for euthanasia of animals when it is the only drug administered and is therefore given to an animal that is awake. (SHTr.:214-15.)

At the state level, the state habeas court first, based on the information provided from the TDCJ, found that the three drugs used in an execution are sodium thiopental, pancurium bromide, and potassium chloride.  The state court further found that sodium thiopental is administered to render the inmate unconscious and insensible to pain, pancurium bromide is administered to relax the chest wall muscles and diaphragm, and potassium chloride is administered in a dose designed to stop the heart and hasten death. (SHTr.:255.)  The state court also found, based on the article authored by Kyle Janek, that a condemned inmate receives three grams of sodium thiopental, which is ten times the 300 milligram normal dose for a 220-pound man.  The court further found that the guidelines of the AVMA prohibiting the use of pancuronium bromide only address circumstances where that is the only medication given and do not address situations where sodium thiopental is used as an anesthetic. (SHTr.:255-56.)  The state habeas court then concluded

46

that the lethal-injection process used by Texas as its method of execution does not violate Hankins's constitutional right to be free from cruel and unusual punishment. (SHTr.:257.)

2. *Analysis*

Hankins has not shown by clear and convincing evidence that the factual findings made by the state court are incorrect. Moreover, Hankins has not shown that the conclusion reached by the state habeas court is contrary to clearly established law. *See* 28 U.S.C. § 2254(d)(1) & (e)(1). Accordingly, he is not entitled to relief based on this claim.

Hankins argues that his Eighth Amendment right to be free from cruel and unusual punishment would be violated by the Texas method of execution because there is a substantial risk of "wanton and unnecessary infliction of pain, torture or lingering death." (Petition at 66). *See also Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459, 464 (1947). Hankins argues that this substantial risk exists because sodium thiopental is a short-acting anesthetic which may wear off in minutes and cause an inmate to awaken, because it has a short shelf life once it is in liquid form, because it is sometimes difficult to find an appropriate vein in an inmate, and because the dose of sodium thiopental given does not differ based on an inmate's drug history, drug tolerance, or size. (Petition at 67-8.)

47

The Fifth Circuit has not considered the merits of a claim that the method of lethal injection constitutes cruel and unusual punishment since *Woolls v. McCotter*, 798 F.2d 695 (5th Cir. 1986). In that case, Woolls asserted that the Texas method of lethal injection was unconstitutional due to the use of sodium thiopental because, when administered by untrained personnel or in improper dosages, the drug might cause conscious death by suffocation.  The Fifth Circuit concluded that Woolls had failed to make a substantial showing of the denial of his right to be free from cruel and unusual punishment because the affidavits he submitted contained neither allegations nor evidence that anyone other than trained medical staff administer lethal injections or that improper dosages of sodium thiopental have been or will be administered. *Id*. at 697-98.

More recently, the Ninth Circuit has addressed the particular issues raised by Hankins.  In *Cooper v. Rimmer*, 379 F.3d 1029, 1032-33 (9th Cir. 2004), the Ninth Circuit, in denying a stay of execution, found that similar affidavits from Dr. Weinstein and Dr. Heath fell short of showing that the inmate was subject to an unnecessary risk of unconstitutional pain or suffering, given that the State of California had submitted an affidavit from an anesthesiologist stating that the five-gram dose of sodium thiopental administered would result in 99.999999999999% of the population being rendered unconscious within sixty seconds and that

48

it would cause virtually all persons to stop breathing within a minute, prior to the administration of the pancuronium bromide. Again, in *Beardslee v. Woodford*, 395 F.3d 1064, 1073-76 (9th Cir.), *cert. denied*, 543 U.S. 1096 (2005), the Ninth Circuit held that an inmate had failed to show a likelihood that he would be conscious during the administration of pancuronium bromide and potassium chloride to experience pain.  This holding came despite the AVMA's guidelines against using pancuronium bromide and the possibility that he would receive an improper dosage of sodium thiopental, given the undisputed evidence before the court that an administration of five grams of sodium thiopental will produce unconsciousness, and perhaps death, if properly administered. Subsequently, in *Morales v. Hickman*, 438 F.3d 926, 929-30 (9th Cir.), *cert. denied*, 126 S.Ct. 1314 (2006), the Ninth Circuit held that the district court had not abused its discretion by permitting the presence of an anesthesiologist at the execution to insure that Morales was unconscious during the procedure, given that this decision was based on a review of execution logs by the district court, which revealed some doubt that California's protocol was being followed as intended.

In the instant case, while Hankins voices general concerns that the sodium thiopental will not be administered correctly during his execution, he does not dispute the state habeas court's factual finding that the amount of the drug he would receive would

49

be ten times the normal therapeutic dose for a 220-pound man, much less present clear and convincing evidence controverting this finding.  Moreover, as in *Woolls v. McCotter*, Hankins has failed to present any evidence at the state or federal level that anyone other than trained medical staff administer lethal injections or that improper dosages of sodium thiopental have been or will be administered.  Thus, as in *Cooper v. Rimmer*, the concerns voiced in the affidavits submitted by Hankins fail to show that he will be subject to an unnecessary risk of unconstitutional pain or suffering.  The state habeas court's decision denying this claim is not contrary to federal law.  This ground is without merit, and it is denied.

H.  *Request for Evidentiary Hearing*

Hankins also requests that this Court grant him an evidentiary hearing with respect to grounds one through nine. (Petition at 20). Hankins asserts that he is entitled to an evidentiary hearing in federal court on these issues because he did not receive one during the state habeas proceeding and because he did not fail to develop his claims at the state level. *See* 28 U.S.C. § 2254(e)(2).

Even if a petitioner does not fail to develop his factual claims in state court, he is not necessarily entitled to a hearing in federal court.  Rather, as the Fifth Circuit has explained in recent cases, in order to be entitled to an evidentiary hearing in federal court, even where, as in the instant case, no evidentiary

50

hearing was conducted by the state habeas court, a habeas petitioner must show either a factual dispute which, if resolved in his favor, would entitle him to relief *or* in the very least a factual dispute that would require development in order to assess the claim. *Murphy v. Johnson*, 205 F.3d 809, 815 (5th Cir. 2000); *Robison v. Johnson*, 151 F.3d 256, 268 (5th Cir. 1998).

In the case at hand, Hankins has not shown any factual dispute that would require any further factual development in order to assess the merits of the claim. This Court has accepted all of Hankins's non-record evidence in considering his claims and ruled on these claims accordingly, assuming all of Hankins's non-record evidence to be accurate. Hankins is not entitled to a hearing, and his request for an evidentiary hearing is denied.

It is further ORDERED that Petitioner's Petition for Writ of Habeas Corpus be, and is hereby, DENIED.

It is further ORDERED that the clerk of the Court shall transmit a copy of this order to Petitioner by certified mail, return receipt requested.

SIGNED March 30, 2007.

TERRY R. MEANS
UNITED STATES DISTRICT JUDGE